[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-11535

————————————————

D.C. Docket No. 4:13-cv-02150-RDP

CASEY A. MCWHORTER,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS, et al.

Respondents - Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

(August 18, 2020)

Before WILSON, MARTIN, and ED CARNES, Circuit Judges.

MARTIN, Circuit Judge:

Casey McWhorter, an Alabama death row prisoner, appeals the District Court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Mr. McWhorter raises two issues in this appeal: (1) whether his constitutional right to an impartial jury was violated by the presence of a biased juror; and (2) whether trial counsel was ineffective for failing to investigate and present mitigating evidence. After careful consideration, and with the benefit of oral argument, we affirm the denial of Mr. McWhorter's habeas petition.

## I.  BACKGROUND AND PROCEDURAL HISTORY

A. TRIAL AND OFFENSE CONDUCT

In 1993, Mr. McWhorter was indicted and charged in Alabama state court with intentionally killing Edward Williams by shooting him with a rifle during the course of a robbery. He was represented at trial by Thomas Mitchell and James Berry. The guilt phase of trial began on March 17, 1994. Five days later, the jury found Mr. McWhorter guilty. After a brief recess, the penalty phase began.

During the penalty phase, the State and Mr. McWhorter's counsel made opening statements and the State resubmitted the evidence it presented in its case in chief. Mr. McWhorter's counsel argued that McWhorter "had a difficult childhood," and grew up to be "a pretty good kid, but that he got mixed up with the wrong crowd." Counsel went on to call four witnesses during its penalty phase presentation. First, counsel called Vonnie Salee. Ms. Salee previously worked

2

with Mr. McWhorter at the Food World grocery store, and testified that McWhorter was one of the better bag boys and was a hard worker.  Next, counsel called Van Reid.  Mr. McWhorter had worked for Mr. Reid as a busboy, and Reid described McWhorter as a good kid and a dependable worker.

Third, counsel called Elsie Garrison, Mr. McWhorter's aunt.  Ms. Garrison testified that Mr. McWhorter was about 2 years old when his parents divorced. Later, when Mr. McWhorter was around 16, he came to live with Ms. Garrison because his mother believed he was using drugs.  Ms. Garrison described her nephew as a very bright, intelligent, compassionate young man who had a difficult childhood, but emphasized that he "is not a bad boy."  She ended her testimony by asking the jury to spare Mr. McWhorter's life.

Finally, counsel called Carolyn Rowland, Mr. McWhorter's mother.  Ms. Rowland described Mr. McWhorter's childhood.  She said she divorced Mr. McWhorter's father, Tommy McWhorter, remarried David Rowland, and moved the family to Tennessee.  Because Mr. McWhorter was so young when his parents divorced, he believed that his stepfather, Mr. Rowland, was his father.  This illusion was pierced after the family moved back to Alabama and Ms. Garrison told Mr. McWhorter he had two fathers.  Ms. Rowland said this news did not seem to have an effect on Mr. McWhorter at the time, but she explained that complications arose later.  She said as Mr. McWhorter got older, his biological

3

father instructed him that he did not have to listen to his stepfather. Mr.

McWhorter's refusal to listen progressed to the point that Mr. and Mrs. Rowland

"couldn't talk to him." Around the same time, when Mr. McWhorter was about 16

years old, he began socializing with a new set of friends and Ms. Rowland noticed

a change in her previously respectful son. Ms. Rowland closed her testimony by

asking the jury to spare her son's life.

After about an hour of deliberating, the jury told the trial court it could not

reach an agreement on the sentence. The court explained that it was not trying "to

force or coerce [the jury] to reach a verdict," but reminded the jurors about the

importance of reaching a verdict. Later that day, after further deliberations, the

jury returned and rendered a verdict recommending the death penalty by a 10-to-2

vote. The trial court followed the jury's recommendation and sentenced Mr.

McWhorter to death.

B. STATE POSTCONVICTION

After exhausting his direct appeals, Mr. McWhorter, through new counsel,

filed a state postconviction motion under Alabama Rule of Criminal Procedure 32.

Two of the claims Mr. McWhorter raised are relevant here. First, he claimed he

was denied an impartial jury. He said that a juror, Linda Burns, deliberately

provided a false answer on the voir dire questionnaire. The question asked

whether Ms. Burns knew anyone who had been a victim of a crime, and she failed

to disclose that her father died under suspicious circumstances.  Second, Mr. McWhorter claimed his trial counsel was ineffective for failing to investigate and present mitigation evidence during the penalty phase of his trial.  The state court held an evidentiary hearing on Mr. McWhorter's Rule 32 motion from August 26–28, 2009.  Mr. McWhorter presented a significant amount of evidence.

Mr. McWhorter called four witnesses in connection with his biased jury claim.  He called Ms. Burns, the purportedly biased juror, who testified about the circumstances of her father's death as well as her thoughts at the time she answered the voir dire questionnaire.  We discuss Ms. Burns's testimony in more detail below.  Mr. McWhorter also called April Stonecypher, another of the jurors at his trial.  Ms. Stonecypher testified that during deliberations, Ms. Burns "started telling a story about how years before . . . her father had been murdered, and that . . . she now had to walk around in the same town where this man was that killed her father."  Ms. Stonecypher said that Ms. Burns was crying when she said this.  And Mr. Mitchell and Mr. Berry, Mr. McWhorter's trial counsel, testified about their process of selecting jurors during voir dire.

Mr. Mitchell and Mr. Berry also testified in connection with Mr. McWhorter's ineffective assistance claim.  Both described their "good kid, wrong crowd" theory of mitigating evidence.  Counsel explained that they interviewed Mr. McWhorter, his mother, aunt, and sister; gathered background information;

5

and hired a neuropsychologist, Dr. Douglas Robbins. Because Dr. Robbins found that Mr. McWhorter's neuropsychological testing results were "unremarkable," counsel said they chose not to have him testify at the penalty stage. Dr. Robbins testified at the Rule 32 hearing and confirmed his (lack of) mental health findings, explaining that he did not find any evidence of brain damage.

Mr. McWhorter presented additional witnesses who he said would have furthered counsel's "good kid, wrong crowd" theory. Frank Baker, Mr. McWhorter's former math teacher and basketball coach, testified that McWhorter was an average student who didn't cause trouble in class and worked hard to improve his basketball game and be part of the team. Kenneth Burns, another former teacher, testified that Mr. McWhorter was "a good kid" and an average student who worked diligently to get Bs and Cs. Mr. McWhorter's friend, Amy Battle, also testified that McWhorter was a "great kid" who was "funny and outgoing and flirty."

Mr. McWhorter also presented evidence of his significant history of substance abuse. Mr. Rowland, Mr. McWhorter's stepfather, testified that McWhorter was a great kid until he reached the age of 10. It was at that point that Mr. McWhorter's attitude changed and he started huffing gasoline and freon. Mr. Rowland also said Mr. McWhorter stole Rowland's truck. Mr. McWhorter was sent to a detention home for 30 days. Following these incidents, Mr. McWhorter

6

lived with his aunt, Ms. Garrison, for 3–4 months and then with his friend Abraham Barnes's family.

Two members of Mr. McWhorter's family, Larry Evans and Michael Evans, provided more details about McWhorter's childhood substance abuse. Larry said that on a few occasions he, Mr. McWhorter, and other young family members huffed gasoline until they passed out. Larry also testified that huffing gasoline "would make you where you can't remember." Michael's testimony about Mr. McWhorter's drug use was similarly disconcerting. He said that he and Mr. McWhorter huffed gasoline several times a day on the weekends for 2–3 years. The Evanses also testified that Mr. McWhorter's grandfather, Jesse Evans, was a physically violent alcoholic. They said that Mr. McWhorter "could have" been around Jesse when he was hitting McWhorter's grandmother, because McWhorter often visited his grandparents on the weekends.

Mr. McWhorter's high school friends gave more testimony about his substance abuse. Tiffany Long, who dated Mr. McWhorter when she was 15, testified that she and McWhorter "drank pretty much every time [they] were together." Abraham Barnes, who was "like [a] brother[]" to Mr. McWhorter, said the two teenagers drank "[w]hen we were awake . . . . If we weren't in school . . . , we were drinking." When they were drinking, they took turns playing Russian

roulette with a loaded pistol. Mr. Barnes testified that he and Mr. McWhorter did these things because they never thought they would live to see adulthood.

Next, Ms. Garrison testified and expanded on the testimony she gave during the penalty phase, explaining the difficulties Mr. McWhorter experienced as a child. She said Tommy McWhorter (Mr. McWhorter's biological father) drank a lot, did not work, neglected McWhorter, and abused McWhorter's mother. Ms. Garrison said when Mr. McWhorter was about 10 years old, he started rebelling against his mother and stepfather. Mr. Rowland responded by "whip[ping]" him. On one occasion, Ms. Garrison saw bruises from one of these whippings and reported the Rowlands to social services. After that, Mr. McWhorter's behavior got worse. He went from not listening, to sneaking out of the house, to stealing his stepfather's car.[1] Shortly after he took the car, Ms. Garrison took Mr. McWhorter in. To provide him with some structure, she required that he follow her rules, including abstaining from alcohol. Nevertheless, after a few months, Ms. Garrison found Mr. McWhorter so drunk that she thought he was dead. He also stole Mr. Rowland's truck again and crashed it. After crashing the truck, Mr. McWhorter went back to living with the Rowlands.

---

[1] As a result of this incident, Ms. Rowland sent Mr. McWhorter to stay with his grandparents a few days each week.

8

Finally, two experts testified about the effects of Mr. McWhorter's difficult childhood and substance abuse on his mental health. Janet Vogelsang, a licensed clinical social worker, performed a "biopsychosocial assessment" of Mr. McWhorter and his family. Ms. Vogelsang explained that she gathered a vast amount of information that shed light on how Mr. McWhorter was "shaped" and "molded." Based on her research, Ms. Vogelsang opined that Mr. McWhorter was "robb[ed] . . . of the opportunity to have a strong male role model;" was neglected by his biological father; and had no adult supervision during his early teenage years. Ms. Vogelsang said these combined events all had a huge impact on Mr. McWhorter and corresponded with the escalation in his drinking and drug use.

Dr. Ralph Tarter, a neuropsychologist who specializes in adolescent alcoholism and the relationship between alcoholic parents and their children, testified as well. Dr. Tarter did not perform a psychological evaluation of Mr. McWhorter, but he reviewed the record and opined that Dr. Robbins (who concluded that McWhorter's neurological test was unremarkable, and whom trial counsel did not have testify) did not ask all the "crucial" questions necessary for a complete evaluation. Dr. Tarter said that without obtaining a complete evaluation it was not possible to get a full understanding of Mr. McWhorter's clinical profile. Nevertheless, Dr. Tarter agreed with Dr. Robbins that Mr. McWhorter's evaluation showed he had a "high energy level, poor behavioral control and limited

9

intellectual capacity to override that deficiency." Dr. Tarter, however, said that he would have performed additional tests based on these results. Additional tests would have "identif[ied] and measure[d] the severity of neuropsychologic deficit," which is a "chemical" dysfunction in the brain, as opposed to structural brain damage. Finally, Dr. Tarter said, based on reports about Mr. McWhorter's biological father, McWhorter was genetically predisposed to become an alcoholic. The fact that Mr. McWhorter grew up in an unstable environment and huffed gasoline at a young age made this genetic risk more significant.

After hearing all of this evidence, the state court denied Mr. McWhorter's petition on both the biased jury claim and the ineffective assistance claim. The state court first found that Mr. McWhorter did not meet his burden to show that Ms. Burns believed her father was the victim of a crime and failed to disclose that fact during voir dire. The court explained that "[d]espite the rumors of murder that she heard as a child, Burns had reason to believe that her father's death was not a homicide." It also determined that Mr. McWhorter was not prejudiced by Ms. Burns's presence on the jury. In finding that Mr. McWhorter failed to show Ms. Burns's decisions "might have been affected by her father's death," the state court relied on Ms. Burns's "unequivocal" testimony "that her father's death did not affect her role as a juror."

10

Second, the state court dismissed Mr. McWhorter's ineffective assistance claim that trial counsel failed to investigate mitigating evidence. It found that trial counsel's "good kid, wrong crowd" strategy was a reasonable strategy, and that counsel presented testimony to support that strategy during the guilt and penalty phases. The court specifically noted that Dr. Robbins's report "provided no useful mitigation evidence" and did not fault trial counsel for not presenting mental-health-related evidence. It also analyzed counsel's decision not to present the testimony of each individual witness and concluded that counsel's performance was not deficient in each instance.

Mr. McWhorter appealed the denial of his Rule 32 motion to the Alabama Court of Criminal Appeals ("CCA"). The CCA affirmed the denial of Mr. McWhorter's biased jury claim, reasoning that although Ms. Burns "appeared to waver in her responses to postconviction counsel's questioning . . . we cannot say that [she] failed to respond truthfully to the question posed on the juror questionnaire." McWhorter v. State, 142 So. 3d 1195, 1218–19 (Ala. Crim. App. 2011). The CCA further held there was "no indication that McWhorter might have been prejudiced by [Ms. Burns's] failure to respond that her father was a victim of a crime on the juror questionnaire or to a voir dire question." Id. at 1221.

The CCA also affirmed the denial of Mr. McWhorter's ineffective assistance claim. It quoted the state court's reasoning:

11

> Experienced trial counsel collected the comprehensive
> background information . . . , Dr. Robbins's evaluation,
> and other documents, and formulated a reasonable strategy
> that they believed could save McWhorter's life:
> McWhorter was a good boy, who fell in with the wrong
> crowd, and he made a terrible mistake but does not deserve
> the death penalty,

Id. at 1237.  The CCA ultimately upheld the state court's finding that trial counsel's mitigation strategy was reasonable.  Id. at 1238, 1245.  The CCA was also "confident that the mitigating evidence presented at the postconviction hearing—but omitted from the penalty phase of McWhorter's capital-murder trial—would have had no impact on the sentence in this case."  Id. at 1250.  The CCA's decision is the decision we review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  See 28 U.S.C. § 2254(d); see also Morton v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1157, 1165–66 (11th Cir. 2012).

C. FEDERAL HABEAS

Mr. McWhorter filed his federal habeas petition in the United States District Court for the Northern District of Alabama on November 25, 2013.  The District Court denied Mr. McWhorter's petition for the same reasons relied on by the state courts.  In denying the biased jury claim, the District Court held that the CCA's "findings – that McWhorter failed to prove that Juror Burns intentionally gave an answer she knew to be false, and failed to prove that Ms. Burns' answer prejudiced him in any way – are consistent with" clearly established Supreme Court

12

precedent.  McWhorter v. Dunn, No. 4:13-CV-02150-RDP, 2019 WL 277385, at

*26 (N.D. Ala. Jan. 22, 2019).  When explaining its decision to deny Mr.

McWhorter's ineffective assistance claim, the District Court said the state court's

findings are supported by the record, id. at *43, and it was not unreasonable for the

CCA to "conclude that the additional evidence offered by McWhorter would not

have resulted in a different sentence," id. at *48.

## II.  STANDARD OF REVIEW

We review de novo a district court's denial of a habeas corpus petition.

Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010).  A petitioner is entitled to

habeas relief only if his claim is meritorious and the state court's resolution of that

claim was contrary to, or an unreasonable application of, clearly established

Supreme Court precedent, or was based on an unreasonable determination of the

facts presented in the state court proceeding.  28 U.S.C. § 2254(d).

"Contrary to" means the state court applied "a rule different from the

governing law set forth in [Supreme Court] cases," or it decided a case differently

than the Supreme Court has done "on a set of materially indistinguishable facts."

Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002).  A state court's

resolution of a claim is an "unreasonable application" of federal law when its

decision (1) "identifies the correct governing legal rule from [the Supreme] Court's

cases but unreasonably applies it to the facts of the particular state prisoner's case,"

or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams v. Taylor, 529 U.S. 362, 407, 120 S. Ct. 1495, 1520 (2000).  The Supreme Court has said an "unreasonable determination of the facts" occurs "when the direction of the evidence, viewed cumulatively, was 'too powerful to conclude anything but [the petitioner's factual claim],' and when a state court's finding was 'clearly erroneous.'"  See Landers v. Warden, 776 F.3d 1288, 1294 (11th Cir. 2015) (first quoting Miller-El v. Dretke, 545 U.S. 231, 265, 125 S. Ct. 2317, 2339 (2005), then quoting Wiggins v. Smith, 539 U.S. 510, 529, 123 S. Ct. 2527, 2539 (2003)) (alteration in original).

### III.  DISCUSSION

A. BIASED JURY CLAIM

Mr. McWhorter's biased jury claim centers around his theory that Ms. Burns lied during voir dire when she said she did not know anyone who was the victim of a crime.  The backstory is as follows.  When Ms. Burns was a child, her father, Olive Daniels, went out one night with two other men, Langford Crawley and Charles Taylor, to a pond in an abandoned rock mine.  The next morning, an officer came to Ms. Burns's house and told her family that Mr. Taylor had been beaten to death and Mr. Daniels was missing.  A police diver then found Mr.

14

Daniels dead at the bottom of the pond with bruises around his neck. However, the autopsy concluded that Mr. Daniels's cause of death was drowning. Mr. Crawley was charged with and convicted of the murder of Mr. Taylor, but no charges were ever brought against him for Mr. Daniels's death.

During voir dire at Mr. McWhorter's trial, the prospective jurors were given a questionnaire. Ms. Burns answered question 21 as follows:

21. Have you, any member of your family or anyone you know ever been the victim of a crime?   yes
    If yes, who and what relationship?    Steve Burns Brother-in-law
    What was the crime?   Drugs
    Was anyone arrested in connection with the crime?   yes
    Was anyone convicted in connection with the crime?   yes

When Mr. McWhorter's counsel questioned Ms. Burns about her response to question 21, she agreed with counsel's suggested clarification and said that her brother-in-law had been convicted of a drug crime. At no point in time did Ms. Burns disclose that her father died under suspicious circumstances. She was ultimately selected as a juror.

Mr. McWhorter says his constitutional rights were violated because he was deprived of an unbiased jury by Ms. Burns's failure to disclose the facts surrounding her father's death. He first claims the CCA unreasonably agreed with the state court's finding that Ms. Burns was not intentionally dishonest when she

15

answered the juror questionnaire.  Second, he claims the CCA's application of Alabama's biased jury standard was contrary to clearly established federal law.

In reviewing Mr. McWhorter's claims, we first describe the standard he must meet to show that Ms. Burns was biased and that bias affected his Sixth Amendment right to an impartial jury.  Next, we hold that the state court's determination that Ms. Burns was not intentionally dishonest was not unreasonable because her testimony about how she believed her father died was equivocal.  Finally, we hold that the state court's application of Alabama's version of the biased-jury analysis was not contrary to clearly established federal law.

### 1.  Legal Standard

Voir dire protects the Sixth Amendment right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554, 104 S. Ct. 845, 849 (1984).  In McDonough, the Supreme Court held that to obtain a new trial when a juror gives a "mistaken, though honest response" to a voir dire question, the defendant (1) "must first demonstrate that a juror failed to answer honestly a material question on voir dire," and (2) "then further show that a correct response would have provided a valid basis for a challenge for cause."  Id. at 555–56, 104 S. Ct. at 849–50.  This is because "[t]he motives for concealing

16

information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Id. at 556, 104 S. Ct. at 850.

The first prong of the McDonough test requires us to determine whether Ms. Burns was intentionally dishonest in answering the questionnaire; "that is, whether [she] was aware of the fact that [her] answers were false." United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984). The second prong—whether a correct response would have provided a valid basis for a challenge for cause— requires us to determine whether Ms. Burns's nondisclosure resulted from actual bias that would disqualify her. Id. at 1532; see United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) (per curiam). Bias may be shown in two ways: "by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." Perkins, 748 F.2d at 1532 (quotation marks omitted). Often, the juror's dishonesty in and of itself is "a strong indication" that she was not impartial. See id.

2. The CCA Did Not Unreasonably Determine that Ms. Burns Was Not Dishonest.

Mr. McWhorter argues that the CCA unreasonably determined that Ms. Burns was not intentionally dishonest. He relies on two points to show Ms. Burns's alleged dishonesty: (1) her failure to disclose during voir dire that she believed her father was murdered; and (2) her "tearful[]" statements, made to other jurors during deliberations, about her belief that her father's murderer received

17

lenient treatment. In support of these claims, Mr. McWhorter points to the testimony of Ms. Burns describing "her lifelong belief that her father had been murdered." And, to the extent that Ms. Burns's testimony was equivocal about whether she believed this was true, Mr. McWhorter says "any doubt" is erased by Ms. Stonecypher's testimony that a crying Burns told the other jurors that her father had been murdered.[2]

Based on our review of Ms. Burns's testimony at the Rule 32 hearing, we conclude her testimony was equivocal as to whether she believed her father had been murdered. For instance, Ms. Burns said she "always thought that [her] father was killed" by Mr. Crawley. But at other points during the hearing, she reiterated the opposite and agreed that she believed her father had drowned based on the official cause of death and that her only basis for thinking her father had been murdered came from family rumors during her childhood.

As the CCA pointed out, whether Ms. Burns was dishonest turns on her understanding what it means to be a "victim" of a crime. McWhorter, 142 So. 3d at 1218–19. Ms. Burns's lack of understanding, both at trial and years later at the

---

[2] Traditionally, the failure to disclose information and the insertion of extraneous information into deliberations are analyzed as separate instances of misconduct. Perkins, 748 F.2d at 1531, 1533 (analyzing separately allegations of nondisclosure of information during voir dire and insertion of extraneous information into jury deliberations). Mr. McWhorter is appealing only the nondisclosure claim here because, as he acknowledges, the Rule 32 court admitted Ms. Stonecypher's testimony about Ms. Burns's deliberation statements only with respect to McWhorter's nondisclosure claim, not his extraneous evidence claim.

Rule 32 hearing, is evident from the record.  For example, Ms. Burns responded to the juror questionnaire by saying her brother-in-law had been the victim of the crime of drugs—while later explaining, in response to questions from trial counsel, that her brother-in-law was convicted of a drug crime.  And when Mr. McWhorter's postconviction counsel tried to flesh out her understanding at the Rule 32 hearing, Ms. Burns testified as follows:

> Q. Now, when you said a moment ago that you weren't thinking about your father's death when you answered that item on the questionnaire; is that correct?
>
> A. Yes.
>
> Q. Well, you also said a moment ago, didn't you, that you believe your father was not a victim because no one had been officially charged in your father's murder?
>
> A. Now, wait.  You say my father was not a victim?
>
> Q. That you -- I believe -- did you say a moment ago to [the prosecutor] that you didn't believe your father was a victim because no one had been officially charged with killing him?
>
> A. Yes, I said that.
>
> Q. Now, did you answer the question in the way you did, namely, not mentioning your father because no one had been officially charged with killing him?
>
> A. No one -- I guess, because no one had been charged with his death.
>
>     . . .
>
> Q. Now, was this belief or knowledge that no one had been officially charged the reason why you didn't mention him in response to this question on the questionnaire?
>
> A. Well, I don't know. I still -- I'm still confused about what you're asking me.  I'm sorry.  I did not put his name on there because he was not murdered. He was drowned.

19

Ms. Burns's "varied responses [about the] question on <u>voir dire</u> testify to the fact that jurors are not necessarily experts in English usage." <u>McDonough</u>, 464 U.S. at 555, 104 S. Ct. at 849. Because the record indeed reflects that Ms. Burns's testimony was equivocal, the state court's finding that Burns was not intentionally dishonest was not based on an unreasonable determination of the facts under § 2254(d). See <u>McDonough</u>, 464 U.S. at 555–56, 104 S. Ct. at 849–50 (declining to invalidate trial based on juror's "mistaken, though honest response").

Mr. McWhorter insists that, despite Ms. Burns's equivocal voir dire statements, we can resolve this issue in his favor and conclude she was dishonest. He points to Ms. Stonecypher's testimony that Ms. Burns told the other jurors that "her father had been murdered" years before the trial. In response, the State argues that we cannot consider Ms. Stonecypher's testimony about Ms. Burns's deliberation statements under Alabama Rule of Evidence 606(b).[3] We need not reach that issue here. Ms. Burns's testimony about her state of mind during voir dire provides evidence to support the Rule 32 court's factual findings and credibility determinations. See <u>Brumfield v. Cain</u>, 576 U.S. 305, 313–14, 135 S.

---

[3] Rule 606(b) provides that "a juror may not testify in impeachment of the verdict . . . as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the" juror's decision. However, this rule does allow a juror to testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

20

Ct. 2269, 2277 (2015) ("We may not characterize these state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." (alteration adopted) (quotation marks omitted)). Therefore, the CCA's finding that Ms. Burns did not "fail[] to respond truthfully" to the voir dire questionnaire, McWhorter, 142 So. 3d at 1218–19, was not an unreasonable determination of the facts.

> 3. The CCA's Failure to Apply the *McDonough* Test Was Not Contrary to Clearly Established Law.

In analyzing the second prong of Mr. McWhorter's biased jury claim, the CCA required him to show "that he 'might have been prejudiced' by the jurors' failure to respond truthfully to a question posed on voir dire." McWhorter, 142 So. 3d at 1219 (quoting Ex parte Stewart, 659 So. 2d 122, 124 (Ala. 1993) (per curiam)). Mr. McWhorter thus challenges the CCA's failure to apply the second prong of the McDonough test—that "a correct response would have provided a valid basis for a challenge for cause," 464 U.S. at 556, 104 S. Ct. at 850—because he asserts that failure is contrary to clearly established law.

Alabama courts have not adopted either prong of the McDonough test. See Brown v. State, 807 So. 2d 1, 9 n.6 (Ala. Crim. App. 1999) (per curiam). Instead, Alabama courts say the proper standard for determining whether juror misconduct warrants a new trial "is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant." Ex parte Dobyne, 805 So. 2d

21

763, 771 (Ala. 2001). Whether this rule—and the CCA's application of it in Mr. McWhorter's case—is "contrary to" McDonough under § 2254(d) depends on whether it "contradicts the governing law set forth in [the Supreme Court's] cases." Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003) (quotation marks omitted).

The CCA's analysis appears to be in accordance with McDonough. The CCA acknowledged that under Alabama's might-have-prejudiced standard, the "form" of prejudice that would entitle Mr. McWhorter to relief would be the nondisclosure's "effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror." McWhorter, 142 So. 3d at 1211 (quotation marks omitted); see also id. at 1212 (addressing McWhorter's claims "[i]n light of the foregoing"). The CCA then asked whether the facts showed "there was probable prejudice," and looked to certain factors, including "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." Id. at 1211 (quotation marks omitted).

This analysis by the CCA mirrors the analysis our Court has followed under McDonough, which looks to facts "showing . . . a close connection" between the biased juror and the circumstances of the case. See Carpa, 271 F.3d at 967. Said

22

another way, both Alabama's might-have-prejudiced standard and <u>McDonough</u> depend on whether the juror's bias may have influenced the verdict against the defendant. <u>Compare</u> <u>McDonough</u>, 464 U.S. at 554, 104 S. Ct. at 849 (holding that a "touchstone of a fair trial is an impartial trier of fact") <u>with</u> <u>Ex parte Dobyne</u>, 805 So. 2d at 771 (explaining that the focus of whether a defendant was prejudiced is grounded in whether the juror might have unlawfully influenced the verdict).

Neither did the CCA unreasonably apply these standards. In concluding that Ms. Burns's nondisclosure on the juror questionnaire did not prejudice Mr. McWhorter, the CCA relied on the Rule 32 court's finding that Burns "was unequivocal that her father's death did not affect her role as a juror." <u>McWhorter</u>, 142 So. 3d at 1221 (quotation marks omitted). The CCA also cited favorably to facts established in the Rule 32 proceedings. Those facts included that Mr. Daniels's death was not close in time to when Mr. McWhorter was tried; Ms. Burns's failure to provide the information was "less likely to have affected her role as a juror" due to her uncertainty over the circumstances of her father's death; and she testified she did not want to "vindicate the death of her father through this trial." <u>Id.</u> (quotation marks omitted). In conducting this type of analysis, our Court has looked to similar factors, including whether the juror expressly admitted bias, was intentionally dishonest, or was "closely connected to the case or to either party." <u>See</u> <u>Carpa</u>, 271 F.3d at 967; <u>BankAtlantic v. Blythe Eastman Paine</u>

23

Webber, Inc., 955 F.2d 1467, 1473 (11th Cir. 1992). The CCA, in effect, performed the same analysis required by McDonough.

Because the CCA's analysis was not contrary to McDonough under § 2254(d)(1), and because, as we have already described, Mr. McWhorter failed to carry his burden on the first prong of the McDonough test, we need not reach the merits of whether there would have been a valid basis to challenge Ms. Burns for cause pursuant to McDonough's second prong. Cf. BankAtlantic, 955 F.2d at 1473 (declining to reach the first prong "because the district court properly found that BankAtlantic failed to show that correct responses from [the jurors] would have provided a valid basis for a challenge for cause"). Thus, we affirm the District Court's dismissal of Mr. McWhorter's biased jury claim.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. McWhorter also appeals the CCA's denial of his claim of ineffective assistance based on trial counsel's failure to investigate and present additional mitigating evidence. He argues that the CCA unreasonably applied clearly established federal law in deciding that counsel's performance was not deficient. He also claims the CCA made an unreasonable determination of the facts when it concluded that he did not suffer prejudice from counsel's actions.

1. <u>Legal Standard</u>

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The Supreme Court has explained that the <u>Strickland</u> inquiry requires a "probing and fact-specific analysis." <u>Sears v. Upton</u>, 561 U.S. 945, 955, 130 S. Ct. 3259, 3266 (2010) (per curiam).

Counsel's performance is deficient if it "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2064. We apply a "strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id.</u> at 689, 104 S. Ct. at 2065 (quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> at 690–91, 104 S. Ct. at 2066. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Id.</u> at 691, 104 S. Ct. at 2066.

25

To establish prejudice in challenging a death sentence, a petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069. In making the prejudice determination with respect to penalty phase evidence, a reviewing court must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (per curiam) (alteration adopted) (quotation marks omitted). The fact that counsel presented some mitigation evidence does not "foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." Sears, 561 U.S. at 955, 130 S. Ct. at 3266.

2. The CCA Did Not Unreasonably Apply Federal Law When Determining That Counsel's Investigation Was Not Deficient.

Mr. McWhorter challenges the quantity and quality of the mitigating evidence counsel investigated and ultimately presented. The CCA denied this claim, agreeing with the Rule 32 court's factual findings and holding that counsel formulated a reasonable trial strategy. McWhorter, 142 So. 3d at 1245, 1247–48. In this appeal, Mr. McWhorter asserts that trial counsel was ineffective in several ways. First, he says counsel's performance was deficient because counsel chose to present two witnesses that "barely knew" him and two witnesses "with apparent

26

bias." Appellant's Brief at 53–54. Second, he says counsel's performance was deficient because counsel failed to investigate and present two categories of additional mitigating evidence: (a) evidence that fit with counsel's "good kid, wrong crowd" theory, and (b) evidence that he had been abused as a child; substance abuse evidence; evidence that he had a difficult home life; and mental health evidence.

First we address Mr. McWhorter's challenge to trial counsel's decision to present the four witnesses—Van Reid, Vonnie Salee, Elsie Garrison, and Carolyn Rowland—who did testify at the penalty stage. Trial counsel testified that, based on the information provided by Mr. McWhorter and his family, their strategy for both the guilt and penalty phases was to convince the jury that Mr. McWhorter was a good boy who got mixed up with the wrong crowd. Following the guilt phase, counsel felt Mr. McWhorter's case was "in a very, very deep hole": the jury knew McWhorter's co-defendants had pled guilty, they had heard McWhorter "basically" confess to the crime, and they saw a video of the crime scene. Because the jury had already found Mr. McWhorter guilty, counsel felt the only thing going in their favor at the penalty stage was McWhorter's youth. But counsel knew they couldn't just rely on his age and appearance and they presented the four witnesses they previously decided fit with their "good kid, wrong crowd" strategy.

27

Counsel testified about their reasons for choosing these four witnesses.  Mr. Reid knew Mr. McWhorter "closer to the age in which he was accused of committing this crime," as opposed to some of McWhorter's teachers or friends from childhood.  Mr. Reid had come recommended by Ms. Garrison, and Reid's testimony that Mr. McWhorter was a good kid and good worker fit in with counsel's penalty-phase theory.  Ms. Salee was chosen because people "just instinctively like or . . . are drawn to" her.  She also worked at the courthouse, so when the state court judge explained their relationship to the jury, counsel felt that "gave an endorsement to the jury that, hey, this is a good witness."  Counsel asked Ms. Rowland and Ms. Garrison to testify because they were likable, had a close connection with Mr. McWhorter, and the jury "might tend to show some mercy" based on the sympathy they felt for McWhorter's mother and aunt.

After reviewing the record, the choice to call Mr. Reid, Ms. Salee, Ms. Rowland, and Ms. Garrison "might be considered sound trial strategy."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted).  Mr. McWhorter's conclusory statements that his two former employers "barely knew" him, and that his mother and aunt had "apparent bias" does not overcome this presumption.  See Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 2588 (1986) ("Counsel's competence . . . is presumed, and the [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under

28

prevailing professional norms and that the challenged action was not sound strategy." (citation omitted)).

Second, we address counsel's failure to investigate and present additional mitigating evidence. We break this into two categories: the "good kid, wrong crowd" evidence; and the substance abuse, childhood history, family abuse, and mental health evidence.

We turn first to Mr. McWhorter's argument that counsel should have offered additional testimony consistent with their "good kid, wrong crowd" theory. These additional witnesses include Mr. McWhorter's friend, Ms. Battle; his coach and teacher, Mr. Baker; and his teacher, Mr. Burns. See Oral Argument Recording at 49:45–51:25 (May 28, 2020). Counsel testified they did not attempt to interview any of Mr. McWhorter's friends because "[m]ost of his friends [at the time] were either in jail . . . or they were witnesses against him." Neither did counsel attempt to speak with any of Mr. McWhorter's teachers or coaches. To assess whether counsel exercised objectively reasonable judgment by not interviewing potential witnesses like these, we must consider whether counsel knew about these avenues of investigation. See Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538.

It does not appear counsel knew to contact Ms. Battle, Mr. Baker, or Mr. Burns. It is not evident from this record that Mr. McWhorter or his family members told counsel to speak with these witnesses. Rather, when counsel met

29

with Mr. McWhorter's family to gather information, the family explained that

McWhorter "had a lot of friends" and his friends' parents "bragged about how

well-behaved he was." These family members did not, however, provide any

additional information. Nor is there other information in the record that shows

counsel should have plausibly known to pursue these specific witnesses. Thus, this

is not a case in which counsel ignored evidence in their possession that they failed

to pursue. See Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538. We cannot say the

failure to investigate the potential mitigation testimony of Ms. Battle, Mr. Burns,

and Mr. Baker was unreasonable.[4] See Stewart v. Sec'y, Dep't of Corr., 476 F.3d

1193, 1210–11 (11th Cir. 2007) (holding that counsel's investigation was

reasonable because they were not informed about any childhood abuse or

mistreatment).

Next we discuss whether Mr. McWhorter's counsel missed any "red flags"

in connection with the remaining mitigation topics. These topics include

childhood abuse evidence; substance abuse evidence; evidence that Mr.

McWhorter had a difficult home life; and mental health evidence. In order to

---

[4] We take a moment to note, however, that to the extent Mr. McWhorter's trial counsel suggested this sort of evidence fell outside the universe of acceptable mitigation evidence, that understanding is at odds with our precedent. The rule is that mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965 (1978); see also Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003) ("The purpose of [mitigation] investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense." (quotation marks omitted)).

30

perform this analysis, we must first determine "whether a reasonable investigation should have uncovered such mitigating evidence." Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988) (emphasis omitted). "If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel." Id. (emphasis omitted). If the choice was strategic, it "must be given a strong presumption of correctness, and the inquiry is generally at an end." Id. "If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision," then we must determine whether Mr. McWhorter suffered prejudice from that oversight. See id.

Trial counsel interviewed Mr. McWhorter a number of times. Counsel also interviewed Ms. Carolyn Rowland, Melinda Rowland (Mr. McWhorter's sister), and Ms. Garrison. They provided counsel with a long list of information about Mr. McWhorter. This information included things like the names of other family members, friends, and mentors; medical information; details about Mr. McWhorter's childhood and home life, including instances of both "excessive" and "appropriate" discipline; and family criminal history. In response to the question of whether Mr. McWhorter suffered any mental illness or disorder, his family told counsel that he "[h]ad a gas-sniffing habit and freon sniffing habit," but did not provide other information. Neither did Mr. McWhorter give counsel any reason to think he was suffering from mental health problems. Even so, counsel also hired

31

Dr. Robbins to determine whether Mr. McWhorter suffered from any mental impairments.

Based on the above investigation, it is apparent that counsel had knowledge of the mitigation topics Mr. McWhorter claims should have been presented. Now we must determine whether the choice not to present each topic was tactical, or whether it was an oversight. See Middleton, 849 F.2d at 493.

We can easily do away with Mr. McWhorter's claim that substance abuse evidence and evidence of his biological father's problems should have been presented. Counsel testified that they chose not to present evidence of Mr. McWhorter's substance abuse, or about his family members' substance abuse, or of his biological father's personal problems because it may have done more harm than good. This "strategy choice was well within the range of professionally reasonable judgments." Strickland, 466 U.S. at 699, 104 S. Ct. at 2070.

Similarly, counsel testified about their reasons for not presenting mental health evidence. Even though they hired a neuropsychologist, counsel did not have Dr. Robbins testify because, in Robbins's opinion, Mr. McWhorter's neuropsychological testing results were "unremarkable." Counsel worried that if Dr. Robbins testified "there's absolutely nothing wrong" with Mr. McWhorter, that would undermine the possibility that the jury might think he "must have been crazy" to commit such a senseless crime.

Based on our review of counsel's knowledge, their choice to present evidence consistent with their "good kid, wrong crowd" theory and their choice not to call Dr. Robbins were each tactical. See Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."). We therefore hold that counsel's investigation into these witnesses was not unreasonable.

Finally, Mr. McWhorter claims that the abuse he suffered as a child and his difficult home life should have triggered counsel to investigate further. Specifically, he points to the facts that his grandfather was abusive towards his grandmother and that his stepfather gave him a "whipping" severe enough to leave bruises that caused his aunt to call the Department of Human Resources. However, counsel's failure to investigate this evidence was not unreasonable. As to his grandfather's violent tendencies, there is no evidence to show that counsel knew they should speak with the Evans side of Mr. McWhorter's family. See Stewart, 476 F.3d at 1210–11 (holding that failure to investigate evidence of which counsel had no knowledge was reasonable).

As to the "whipping" evidence, counsel did not think it was necessary to investigate further because the Department of Human Resources "didn't find any grounds to take any action" against either Mr. or Ms. Rowland. We have held that abandoning an investigation into a particular area of mitigating evidence before

33

"making a fully informed decision" cannot be a reasonable strategy. See Wiggins, 539 U.S. at 527–28, 123 S. Ct. at 2538. But this case doesn't fall in the category of those with counsel who "abandoned their investigation at an unreasonable point." Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d at 1272 (quotation marks omitted). Here, counsel did follow up. They asked Ms. Garrison and Ms. Rowland about the incident. Based on the responses they got, counsel did not see any reason to ask the Department of Human Resources for copies of the records. We have recognized that "under some circumstances an attorney may make a strategic choice not to conduct a particular investigation." Dobbs v. Turpin, 142 F.3d 1383, 1387 (11th Cir. 1998) (quotation marks omitted). Because we cannot say counsel's failure to ask for the Department of Human Services records was unreasonable, this is one of those circumstances.

\* \* \*

In Mr. McWhorter's case, the CCA held that "although the evidence about McWhorter's childhood is indeed disturbing, it does not necessarily mean that trial counsel was ineffective for failing to offer the additional evidence." McWhorter, 142 So. 3d at 1248. For the reasons described above, we hold that the CCA's conclusion was not based on an unreasonable application of clearly established federal law. Because Mr. McWhorter has failed to meet his burden in showing

34

counsel's performance was deficient, we need not address the prejudice prong of the Strickland inquiry. See Ward, 592 F.3d at 1163.

## IV. CONCLUSION

In sum, we affirm the District Court's denial of Mr. McWhorter's federal habeas petition. The state court's factual determination that Ms. Burns was not intentionally dishonest is not unreasonable. And, although the evidence of Mr. McWhorter's substance abuse—beginning at age 10—is compelling, counsel's decision not to present this evidence because it was contrary to their "good kid, wrong crowd" strategy was also reasonable on this record. Finally, we cannot say the CCA unreasonably applied clearly established federal law in connection with the other mitigating evidence presented at the Rule 32 hearing when it affirmed the denial of Mr. McWhorter's ineffective assistance claim.

**AFFIRMED.**

35